PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
‗‗‗‗‗‗

No. 16-2365
‗‗‗‗‗‗

FEDERAL TRADE COMMISSION;
COMMONWEALTH OF PENNSYLVANIA,
                                        Appellants

v.

PENN STATE HERSHEY MEDICAL CENTER;
PINNACLE HEALTH SYSTEM
‗‗‗‗‗‗

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 1-15-cv-02362)
District Judge:  Honorable John E. Jones, III
‗‗‗‗‗‗

Argued July 26, 2016
Before:  FISHER, GREENAWAY, JR., and KRAUSE,
*Circuit Judges*.

(Filed: September 27, 2016)

David C. Shonka, Sr., *Acting General Counsel*
Joel R. Marcus, *Director of Litigation*
Deborah L. Feinstein
Michele Arington
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

William H. Efron     [ARGUED]
Ryan F. Harsch
Jared P. Nagley
Jonathan W. Platt
Geralyn J. Trujillo
Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004
     *Counsel for Federal Trade Commission*


Bruce L. Castor, Jr., *Solicitor General of Pennsylvania*
Bruce Beemer, *First Deputy Attorney General*
James A. Donahue, III, *Executive Deputy Attorney General*
Tracy W. Wertz, *Chief Deputy Attorney General*
Jennifer Thomson
Aaron L. Schwartz
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120
     *Counsel for Commonwealth of Pennsylvania*

Charles I. Artz
Artz McCarrie Health Law
200 North 3rd Street, Suite 12-B
Harrisburg, PA 17101
	*Counsel for Amicus Curiae Association of Independent Doctors*

Richard P. Rouco
Quinn Conner Weaver Davies & Rouco, LLP
2 - 20th Street North, Suite 930
Birmingham, AL 35203
	*Counsel for Amici Curiae Economics Professors*

Lawrence G. Wasden, *Attorney General of Idaho*
Brett DeLange, *Deputy Attorney General*
Office of Attorney General of Idaho
Consumer Protection Division
954 West Jefferson Street, 2nd Floor
Boise, ID 83720

Robert W. Ferguson, *Attorney General of Washington*
Darwin P. Roberts, *Deputy Attorney General*
Jonathan A. Mark, *Senior Assistant Attorney General*
Office of Attorney General of Washington
Antitrust Division
800 5th Street, Suite 200
Seattle, WA 98104

3

Kamala D. Harris, *Attorney General of California*
George Jepsen, *Attorney General of Connecticut*
Lisa Madigan, *Attorney General of Illinois*
Thomas J. Miller, *Attorney General of Iowa*
Janet T. Mills, *Attorney General of Maine*
Maura Healey, *Attorney General of Massachusetts*
Lori Swanson, *Attorney General of Minnesota*
Jim Hood, *Attorney General of Mississippi*
Tim Fox, *Attorney General of Montana*
Ellen F. Rosenblum, *Attorney General of Oregon*
     *Counsel for Amici Curiae States of Idaho, Washington, California, Connecticut, Iowa, Illinois, Massachusetts, Maine, Minnesota, Mississippi, Montana, and Oregon*

William D. Coglianese
Louis K. Fisher    [ARGUED]
Julie E. McEvoy
Christopher N. Thatch
Adrian Wager-Zito
Alisha M. Crovetto
Jon G. Heintz
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

James P. DeAngelo
Kimberly A. Selemba
McNees Wallace & Nurick LLC
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108
    *Counsel for Penn State Hershey Medical Center and PinnacleHealth System*

4

———

OPINION

———

FISHER, *Circuit Judge*.

At issue in this case is the proposed merger of the two largest hospitals in the Harrisburg, Pennsylvania area: Penn State Hershey Medical Center and PinnacleHealth System. The Federal Trade Commission ("FTC") opposes their merger and filed an administrative complaint alleging that it violates Section 7 of the Clayton Act because it is likely to substantially lessen competition. In order to maintain the status quo and prevent the parties from merging before the administrative adjudication could occur, the FTC, joined by the Commonwealth of Pennsylvania, filed suit in the Middle District of Pennsylvania under Section 13(b) of the Federal Trade Commission Act ("FTC Act") and Section 16 of the Clayton Act, which authorize the FTC and the Commonwealth, respectively, to seek a preliminary injunction pending the outcome of the FTC's adjudication on the merits. The District Court denied the FTC and the Commonwealth's motion for a preliminary injunction, holding that they did not properly define the relevant geographic market—a necessary prerequisite to determining whether a proposed combination is sufficiently likely to be anticompetitive as to warrant injunctive relief. For the reasons that follow, we will reverse. We will also remand the case and direct the District Court to enter the preliminary injunction requested by the FTC and the Commonwealth.

## I. Background

5

## A. Factual Background

Penn State Hershey Medical Center ("Hershey") is a leading academic medical center and the primary teaching hospital of the Penn State College of Medicine. It is located in Hershey, and it offers 551 beds and employs more than 800 physicians, many of whom are highly specialized. Hershey offers all levels of care, but it specializes in more complex, specialized services that are unavailable at most other hospitals. Because of its advanced services, Hershey draws patients from a broad area both inside and outside Dauphin County.

PinnacleHealth System ("Pinnacle") is a health system with three hospital campuses—two located in Harrisburg in Dauphin County, and the third located in Mechanicsburg in Cumberland County. It focuses on cost-effective primary and secondary services and offers only a limited range of more complex services. It employs fewer than 300 physicians and provides 646 beds.

In June 2014, Hershey and Pinnacle (collectively, the "Hospitals") signed a letter of intent for the proposed merger. Their respective boards subsequently approved the merger in March 2015. The following month, the Hospitals notified the FTC of their proposed merger and, in May 2015, executed a "Strategic Affiliation Agreement."

## B. Procedural History

After receiving notification of the proposed merger, the FTC began investigating the combination. Following the investigation, on December 7, 2015, the FTC filed an administrative complaint alleging that the merger violates Section 7 of the Clayton Act. 15 U.S.C. § 18. On December 9, 2015, the FTC and the Commonwealth of Pennsylvania (collectively, the "Government") filed suit in the Middle

District of Pennsylvania. Invoking Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, the Government sought a preliminary injunction pending resolution of the FTC's administrative adjudication. In its complaint, the Government alleged that the Hospitals' merger would substantially lessen competition in the market for general acute care services sold to commercial insurers in the Harrisburg, Pennsylvania market. Am. Compl. ¶ 4, at 3-4 (Dist. Ct. ECF 101). According to the Government, the combined Hospitals would control 76% of the market in Harrisburg. *See* Gov't Br. 3-4.

The District Court conducted expedited discovery and held five days of evidentiary hearings. During the hearings, the District Court heard testimony from sixteen witnesses and admitted thousands of pages of exhibits into evidence.

Following the hearings, the District Court denied the Government's request for a preliminary injunction on the basis that the Government had failed to meet its burden to properly define the relevant geographic market. Without a properly defined relevant geographic market, the District Court held there was no way to determine whether the proposed merger was likely to be anticompetitive. Thus, the Government could not show a likelihood of success on the merits, and its failure to properly define the relevant geographic market was fatal to its motion. The District Court also analyzed what it called "equities," which it held supported denying the injunction request. The Government timely appealed.

## II. Jurisdiction

The District Court had jurisdiction under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which authorizes the FTC to request a preliminary injunction in cases involving

violations of the Clayton Act, and under Section 16 of the Clayton Act, 15 U.S.C. § 26, which likewise authorizes the Commonwealth of Pennsylvania to seek a preliminary injunction. We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## III. Standard of Review

We begin with the familiar standard of review. We review the District Court's "findings of fact for clear error, its conclusions of law *de novo*, and the ultimate decision to grant the preliminary injunction for abuse of discretion." *Miller v. Mitchell*, 598 F.3d 139, 145 (3d Cir. 2010). This standard, though easy enough to articulate, often proves difficult to apply, particularly where, as here, we are asked to review determinations made by the District Court that cannot be neatly categorized as either findings of fact or conclusions of law.

The Government argues that the District Court made "three independent legal errors" in rejecting its proffered geographic market. Gov't Br. 26. Because the errors are legal, the Government would have us apply no deference to the District Court's determination and exercise plenary review of its conclusions. *Id.* at 30-31. The Hospitals disagree. They argue that market definition is a factual dispute to which we should apply the most deferential standard: clear error. Hosps. Br. 15.

On several occasions, this Court, and others, have reviewed district courts' determinations of the relevant geographic market for clear error. *E.g.*, *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 211-13 (3d Cir. 2005); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783-84 (9th Cir. 2015). In determining that clear-error review applied, the Ninth Circuit in *St. Alphonsus*

8

reasoned that "[d]efinition of the relevant market is a factual question 'dependent upon the special characteristics of the industry involved.'" 778 F.3d at 783 (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982)). This characterization of the relevant market arose from the Supreme Court's recognition that "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). Thus, where the definition of the geographic market depends on the "special characteristics" of the healthcare market, we may not overturn the District Court's factual findings unless they are clearly erroneous.

That does not mean, however, that we will always review the District Court's determination of the relevant market for clear error. "Although market definition is generally regarded as a question of fact, a trial court's determination of the market may be reversed where that tribunal has erred as a matter of law." *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3d Cir. 1975); *accord White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 499 (6th Cir. 1983) ("[T]he preponderance of authority holds that the determination of a relevant market is composed of the articulation of a *legal* test which is then applied to the *factual* circumstances of each case."); *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 599-600 (8th Cir. 2009) (holding that "the theory upon which [the plaintiff] relies to reach the conclusion that a single city is the relevant geographic market is legally flawed").

In *American Motor Inns*, we held that the district court erred as a matter of law where its opinion did "not demonstrate a consideration of sufficient factors to constitute the type of economic analysis explicated by the Supreme

9

Court." 521 F.2d at 1252. There, the district court purported to apply the correct standard to determine the relevant product market. The standard was a three-part test set out in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961). Relevant here, the third step of the *Tampa Electric* analysis required the district court to find that "the competition foreclosed by the contract … constitute[d] a substantial share of the relevant market." *Am. Motor Inns*, 521 F.2d at 1250 (quoting *Tampa Elec.*, 365 U.S. at 328). The Supreme Court directed lower courts that, to ascertain whether competition in a substantial share of the market had been foreclosed,

> it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Id.* (quoting *Tampa Elec.*, 365 U.S. at 329).

Although the district court in *American Motor Inns* cited to *Tampa Electric* and purported to apply the *Tampa Electric* test, it did not consider the "the probable immediate and future effects which pre-emption of that share of the market might have within the competitive context of that industry, nor did it in any way advert to the relative strength of the parties." *Id.* at 1252 (internal quotation marks omitted). We explained that by failing to consider this factor required by the economic analysis as announced by *Tampa Electric*,

10

the district court applied the incorrect legal standard. And application of an incorrect legal standard is error as a matter of law. *Id.*

Consistent with the teaching of our precedent, where a district court applies an incomplete economic analysis or an erroneous economic theory to those facts that make up the relevant geographic market, it has committed legal error subject to plenary review. This understanding of economic theory as legal analysis also comports with the Supreme Court's recent observation that it has "felt relatively free to revise [its] legal analysis as economic understanding evolves and … to reverse antitrust precedents that misperceived a practice's competitive consequences." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2412-13 (2015).

As we explain further below, the District Court here cited the hypothetical monopolist test and purported to apply it. Both the Government and the Hospitals agree that the hypothetical monopolist test is the correct standard to apply. But the District Court's application of the hypothetical monopolist test was incomplete and, in many respects, more closely mirrors an economic test that the FTC has abandoned because the test "misperceived a practice's competitive consequences." *Id.* at 2413. Although we accept all of the District Court's factual findings unless they are clearly erroneous, this failure to apply the correct legal standard, i.e., the economic theory behind the relevant geographic market, renders our review plenary.

## IV. Analysis

The Government alleges that the proposed merger of Hershey and Pinnacle violates Section 7 of the Clayton Act. In order to prevent the parties from merging until the FTC can conduct an administrative adjudication on the merits to

11

determine whether the merger violates Section 7, the Government seeks a preliminary injunction under Section 13(b) of the FTC Act.

Section 13(b) of the FTC Act empowers the FTC to file suit in the federal district courts and seek a preliminary injunction to prevent a merger pending a FTC administrative adjudication "[w]henever the Commission has reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (quoting *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1070 (D.D.C. 1997)); *see* 15 U.S.C. § 53(b).

A district court may issue a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). The public interest standard is not the same as the traditional equity standard for injunctive relief. Under Section 13(b), we first consider the FTC's likelihood of success on the merits and then weigh the equities to determine whether a preliminary injunction would be in the public interest. *FTC v. Univ. Health, Inc.*, 938 F.3d 1206, 1217-18 (11th Cir. 1991).

## A. Likelihood of Success on the Merits

We first consider the FTC's likelihood of success on the merits. In its administrative adjudication, the FTC must show that the proposed merger violates Section 7 of the Clayton Act. 15 U.S.C. § 18. Section 7 bars mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly." *Id.* "Congress used the words '*may be* substantially to lessen competition' … to indicate that its concern was with probabilities, not certainties," *Brown Shoe*, 370 U.S. at 323, rendering Section 7's definition of antitrust

12

liability "relatively expansive." *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). At this stage, "[t]he FTC is not required to *establish* that the proposed merger would in fact violate section 7 of the Clayton Act." *H.J. Heinz*, 246 F.3d at 714. Accordingly, "[a] certainty, even a high probability, need not be shown," and any "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

We assess Section 7 claims under a burden-shifting framework. First, the Government must establish a prima facie case that the merger is anticompetitive. If the Government establishes a prima facie case, the burden then shifts to the Hospitals to rebut it. If the Hospitals successfully rebut the Government's prima facie case, "the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent on the Government at all times." *St. Alphonsus*, 778 F.3d at 783 (quoting *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)).

To establish a prima facie case, the Government must (1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive.

### 1. Relevant Market

"Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)). "Without a well-defined relevant market," an examination of the merger's competitive effects would be "without context or meaning." *FTC v. Freeman*

*Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995). The relevant market is defined in terms of two components: the product market and the geographic market. *Id.*; *see Brown Shoe*, 370 U.S. at 324.

### a. Relevant Product Market

There is no dispute as to the relevant product market. The District Court found, and the parties stipulated, that the relevant product market is general acute care ("GAC") services sold to commercial payors. App. 9. GAC services comprise a number of "medical and surgical services that require an overnight hospital stay." *Id.* Though the parties agree as to the relevant product market, the Hospitals strongly dispute the relevant geographic market put forth by the Government.

### b. Relevant Geographic Market

The relevant geographic market "is that area in which a potential buyer may rationally look for the goods or services he seeks." *Gordon*, 423 F.3d at 212. Determined within the specific context of each case, a market's geographic scope must "correspond to the commercial realities of the industry" being considered and "be economically significant." *Brown Shoe*, 370 U.S. at 336-37 (footnote and internal quotation marks omitted). The plaintiff (here, the Government) bears the burden of establishing the relevant geographic market. *St. Alphonsus*, 778 F.3d at 784.

A common method employed by courts and the FTC to determine the relevant geographic market is the hypothetical monopolist test. Under the *Horizontal Merger Guidelines* issued by the U.S. Department of Justice's Antitrust Division and the FTC, if a hypothetical monopolist could impose a small but significant non-transitory increase in price

14

("SSNIP")[1] in the proposed market, the market is properly defined. *Merger Guidelines*, § 4, at 7-8.[2] If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow. *Id.* Important for our purposes, both the Government and the Hospitals agree that this test should govern the instant appeal. *See* Gov't Br. 25; Hosps. Br. 17-20.

The Government argues, as it did before the District Court, that the relevant geographic market is the "Harrisburg area." More specifically, the four counties encompassing and immediately surrounding Harrisburg, Pennsylvania: Dauphin, Cumberland, Lebanon, and Perry counties.

The District Court rejected the Government's proposed geographic market. It first observed that 43.5% of Hershey's patients—11,260 people—travel to Hershey from outside the four-county area, which "strongly indicate[d] that the FTC had created a geographic market that [was] too narrow because it does not appropriately account for where the Hospitals, particularly Hershey, draw their business." App. 13. Second, it held that the nineteen hospitals within a sixty-five-minute drive of Harrisburg "would readily offer consumers an alternative" to accepting a SSNIP. *Id.* Finally, the District Court found it "extremely compelling" that the Hospitals had entered into private agreements with the two

---

[1] The SSNIP is typically about 5%. U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*, § 4.1.2, at 10 (2010) ("*Merger Guidelines*").

[2] "Although the Merger Guidelines are not binding on the courts, they are often used as persuasive authority." *St. Alphonsus*, 778 F.3d at 784 n.9 (citations and internal quotation marks omitted).

15

largest insurers in Central Pennsylvania, ensuring that post-merger rates would not increase for five years with one insurer and ten years with the other. App. 13-14. Refusing to "blind [itself] to this reality," the District Court declined to "prevent [the] merger based on a prediction of what might happen to negotiating position and rates in 5 years." App. 14. The failure to propose the proper relevant geographic market was fatal to the Government's motion, and the District Court denied the preliminary injunction request.

We conclude that the District Court erred in both its formulation and its application of the proper legal test. Although the District Court correctly identified the hypothetical monopolist test, its decision reflects neither the proper formulation nor the correct application of that test. We find three errors in the District Court's analysis. First, by relying almost exclusively on the number of patients that enter the proposed market, the District Court's analysis more closely aligns with a discredited economic theory, not the hypothetical monopolist test. Second, the District Court focused on the likely response of patients to a price increase, completely neglecting any mention of the likely response of insurers. Third, the District Court grounded its reasoning, in part, on the private agreements between the Hospitals and two insurers, even though these types of private contracts are not relevant to the hypothetical monopolist test.

### i. Formulation of the Legal Test

In formulating the legal standard for the relevant geographic market, the District Court relied primarily on the Eighth Circuit's decision in *Little Rock Cardiology*, 591 F.3d 591. According to the District Court, to determine the geographic market, a court must apply a two-part test. First, it must determine "the market area in which the seller operates,

16

its trade area." App. 12 (internal quotation marks omitted) (quoting *Little Rock Cardiology*, 591 F.3d at 598). Second, it "must then determine whether a plaintiff has alleged a geographic market in which only a small percentage of purchasers have alternative suppliers to whom they could practicably turn in the event that a defendant supplier's anticompetitive actions result in a price increase." *Id.* (quoting *Little Rock Cardiology*, 591 F.3d at 598). Under the District Court's inquiry, the "end goal" of the relevant geographic market analysis is "to delineate a geographic area where, in the medical setting, few patients leave … and few patients enter." *Id.* (alteration in original; internal quotation marks omitted) (quoting *Little Rock Cardiology*, 591 F.3d at 598).

This formulation of the relevant geographic market test is inconsistent with the hypothetical monopolist test. Rather, it is one-half of a different test utilized in non-healthcare markets to define the relevant geographic market: the Elzinga-Hogarty test. The Elzinga-Hogarty test consists of two separate measurements: first, the number of customers who come from outside the proposed market to purchase goods and services from inside of it, and, second, the number of customers who reside inside the market but leave that market to purchase goods and services.

The Elzinga-Hogarty test was once the preferred method to analyze the relevant geographic market and was employed by many courts. *See, e.g.*, *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1020-24 (N.D. Cal. 2001); *FTC v. Freeman Hosp.*, 911 F. Supp. 1213, 1217-21 (W.D. Mo.), *aff'd*, 69 F.3d 260 (8th Cir. 1995); *United States v. Rockford Mem'l Corp.*, 717 F. Supp. 1251, 1266-78 (N.D. Ill. 1989), *aff'd*, 898 F.2d 1278 (7th Cir. 1990). But subsequent empirical research demonstrated that utilizing patient flow

17

data to determine the relevant geographic market resulted in overbroad markets with respect to hospitals. Professor Elzinga himself testified before the FTC that this method "was not an appropriate method to define geographic markets in the hospital sector." *In re Evanston Nw. Healthcare Corp.*, 2007 WL 2286195, at \*64 (F.T.C. Aug. 6, 2007).

The Hospitals dispute that the District Court's formulation of the relevant geographic market standard is the Elzinga-Hogarty test. The District Court's opinion does not specifically name or address Elzinga-Hogarty; neither does the Eighth Circuit's opinion in *Little Rock Cardiology*. But *Little Rock Cardiology*'s statement that the market is one in which "'few' patients leave … and 'few' patients enter," 591 F.2d at 598 (alteration in original), is a direct quote from *Rockford Memorial*, 717 F. Supp. at 1267.

In *Rockford Memorial*, the Northern District of Illinois, after observing that, "[i]deally, an area should be delineated where 'few' patients leave an area and 'few' patients enter an area to obtain hospital services," immediately outlined a step-by-step methodology put forward by the defendants' expert "to implement the Elzinga-Hogarty test." *Id.* This methodology proceeded as follows: first, determine the merging hospitals' service area; second, determine the collective service area of all hospitals located within the merging hospitals' service area (this area satisfies the "little out from inside" test); finally, determine the area containing those hospitals that supply 90% of all the business that comes from patients residing in the collective service area (this area satisfies the "little in from outside" test). *Id.*

The standard articulated by the District Court in this case parallels the standard from *Rockford Memorial*, which the *Rockford Memorial* court acknowledged was based on

Elzinga-Hogarty. And the District Court's analysis here proceeded in accordance with the way it articulated the standard. Consistent with this "few patients leave … and few patients enter" test, the District Court relied primarily on the fact that 43.5% of Hershey's patients travel from outside of the Harrisburg area (the Government's proposed geographic market) in order to receive GAC services. This number is a measure of patient inflows—one of the two primary measurements relevant to the Elzinga-Hogarty analysis.

As the *amici curiae* Economics Professors[3] have persuasively demonstrated, patient flow data—such as the 43.5% number emphasized by the District Court—is particularly unhelpful in hospital merger cases because of two problems: the "silent majority fallacy" and the "payor problem." *See* Br. of *Amici Curiae* Economics Professors 11-17. "The silent majority fallacy is the false assumption that patients who travel to a distant hospital to obtain care significantly constrain the prices that the closer hospital charges to patients who will not travel to other hospitals." *Evanston Nw.*, 2007 WL 2286195, at *64 (citing testimony of Professor Elzinga). The constraining effect is non-existent because patient decisions are based mostly on non-price factors, such as location or quality of services. This fallacy is particularly salient here, where the District Court relied almost exclusively on the fact that Hershey attracts many patients from outside of the Harrisburg area. In deciding that patients who travel to Hershey would turn to other hospitals outside of Harrisburg if the merger gave rise to higher prices,

---

[3] *Amici* are a group of 36 economics professors—including Professor Elzinga—who argue that the District Court engaged in faulty economic reasoning, particularly with regard to geographic market definition.

the District Court did not consider that Hershey is a leading academic medical center that provides highly complex medical services. We are skeptical that patients who travel to Hershey for these complex services would turn to other hospitals in the area.

Although the District Court did not employ strict cutoffs to determine whether too many patients enter or leave the proposed market, the silent majority fallacy renders the test employed by the District Court unreliable even in the absence of precise thresholds. In other words, the inadequacy of using patient flow data to determine the geographic market does not depend on whether the District Court used an exact percentage or whether it used a more flexible approach: relying solely on patient flow data is not consistent with the hypothetical monopolist test.[4]

---

[4] The Hospitals further dispute that the District Court applied the Elzinga-Hogarty test because, according to the Hospitals, Elzinga-Hogarty is a "static" test in which courts look at patient inflows and outflows and, upon reaching a certain threshold, stop the inquiry and decide whether the numbers support the relevant geographic market. The Hospitals characterize the District Court's analysis as "dynamic," claiming that, although it considered the patient inflow measure, it did not stop at that finding. The difference, the Hospitals claim, is that the District Court considered that these patients—the 43.5% that travel to Hershey—could practicably utilize a different hospital to defeat a price increase. However, in arriving at the conclusion that patients would turn to other hospitals, the District Court relied exclusively on this measure of patient inflow, save its observation that Central Pennsylvania is largely rural and often requires driving large distances for services. App. 13.

Moreover, even assuming that relying strictly on patient flow data is consistent with the hypothetical monopolist test, the District Court did not consider the other half of the equation: patient outflows. The Government presented undisputed evidence that 91% of patients who live in Harrisburg receive GAC services in the Harrisburg area. Gov't Br. 10.[5] Such a high number of patients who do not travel long distances for healthcare supports the Government's contention that GAC services are inherently local and that, in turn, payors would not be able to market a healthcare plan to Harrisburg-area residents that did not include Harrisburg-area hospitals. Although the District Court was not required to cite every piece of evidence it received, or even on which it relied, citing only patient inflows and ignoring patient outflows creates a misleading picture of the relevant geographic market.

*ii. Likely Response of Payors*

The next problem with utilizing patient flow data—the payor problem—underscores the second error committed by the District Court. By utilizing patient flow data as its primary evidence that the relevant market was too narrow, the District Court failed to properly account for the likely response of insurers in the face of a SSNIP. In fact, it completely neglected any mention of the insurers in the healthcare market. This incorrect focus reflects a misunderstanding of the "commercial realities" of the healthcare market. *Brown Shoe*, 370 U.S. at 336.

As the FTC and several courts have recognized, the

---

[5] We cite to the parties' briefs for facts in the sealed record that have been made public by virtue of the parties' without objection including them in their publicly-filed briefs.

healthcare market is represented by a two-stage model of competition. *See St. Alphonsus*, 778 F.3d at 784 n.10 (calling the two-stage model the "accepted model"). In the first stage, hospitals compete to be included in an insurance plan's hospital network. In the second stage, hospitals compete to attract individual members of an insurer's plan. Gregory Vistnes, *Hospitals, Mergers, and Two-Stage Competition*, 67 Antitrust L.J. 671, 672 (2000). Patients are largely insensitive to healthcare prices because they utilize insurance, which covers the majority of their healthcare costs. Because of this, our analysis must focus, at least in part, on the payors who will feel the impact of any price increase. *Id.* at 682, 692.

The Hospitals argue that there is no fundamental difference between analyzing the likely response of consumers through the patient or the payor perspective. We disagree. Patients are relevant to the analysis, especially to the extent that their behavior affects the relative bargaining positions of insurers and hospitals as they negotiate rates. But patients, in large part, do not feel the impact of price increases.[6] Insurers do. And they are the ones who negotiate

---

[6] The Hospitals put forth evidence that patients are becomingly increasingly sensitive to prices. Hosps. Br. 29. We do not disagree. But despite the increasing sensitivity of patients to pricing—e.g., through high-deductible plans, coinsurance, and tiered networks—the majority of patients do not feel the impact of the price of a specific procedure or at a specific hospital. The Hospitals' own study showed that only 2% of respondents considered out-of-pocket costs in choosing a hospital. Corrected Reply Br. 24. Moreover, the Hospitals have not drawn our attention to any specific evidence about the use of health plans that would result in price sensitivity to patients.

directly with the hospitals to determine both reimbursement rates and the hospitals that will be included in their networks.

Imagine that a hospital raised the cost of a procedure from $1,000 to $2,000. The patient who utilizes health insurance will still have the same out-of-pocket costs before and after the price increase. It is the insurer who will bear the immediate impact of that price increase. Not until the insurer passes that cost on to the patient in the form of higher premiums will the patient feel the impact of that price increase. And even then, the cost will be spread among many insured patients; it will not be felt solely by the patient who receives the higher-priced procedure. This is the commercial reality of the healthcare market as it exists today.

Thus, consistent with the mandate to determine the relevant geographic market taking into account the commercial realities of the specific industry involved, *Brown Shoe*, 370 U.S. at 336, when we apply the hypothetical monopolist test, we must also do so through the lens of the insurers: if enough insurers, in the face of a small but significant non-transitory price increase, would avoid the price increase by looking to hospitals outside the proposed geographic market, then the market is too narrow. This view has been confirmed by several courts. *E.g.*, *St. Alphonsus*, 778 F.3d at 784 & n.10; *see also FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1083-85 (N.D. Ill. 2012) (concluding that managed care organizations will not be an effective constraint on the ability of the merged entity to use its market power to raise prices). It is also consistent with the FTC's view. *In re ProMedica Health Sys., Inc.*, 2012 WL 1155392, at *1-10, *23 n.28 (F.T.C. Mar. 28, 2012), *adopted as modified*, 2012 WL 2450574 (F.T.C. June 25, 2012). It was error for the District Court to completely disregard the role that insurers play in the healthcare market.

We do not mean to suggest that, in the healthcare context, considering the effect of a price increase on patients constitutes error standing alone. Patients, of course, are relevant. For instance, an antitrust defendant may be able to demonstrate that enough patients would buy a health plan marketed to them with no in-network hospital in the proposed geographic market. It would necessarily follow that those patients who purchased the health plan would have to turn to hospitals outside the relevant market (lest they pay significant out-of-pocket costs for an out-of-network hospital). In this scenario, patient response is clearly important, but it is not important with respect to patients' response to the price increase demanded by the post-merger Hospitals. The District Court here did not address this correlated behavior. And although it is possible that this scenario could play out in some healthcare market, to assume that it would in Harrisburg defies the payors' testimony. The payors repeatedly said that they could not successfully market a plan in the Harrisburg area without Hershey and Pinnacle. In fact, one payor that attempted to do just that (with Holy Spirit, a Harrisburg-area hospital, no less) lost half of its membership. Gov't Br. 13-14. That is to say nothing about whether payors would be able to successfully market a plan without *any* Harrisburg-area hospital, which is the less burdensome question the Government was tasked with answering under the hypothetical monopolist test.

### iii. Private Pricing Agreements

Finally, the District Court erred in resting part of its analysis of the relevant geographic market on the private

24

agreements between the Hospitals and the payors.[7] The District Court found it "extremely compelling" that the Hospitals had already entered into contractual agreements with two of Central Pennsylvania's largest payors to maintain the existing rate structure for five years with Payor A and ten years with Payor B. App. 13-14. Because of the agreements, the District Court believed that the FTC was "asking the Court [to] prevent this merger based on a prediction of what might happen to negotiating position and rates in 5 years."

---

[7] The Hospitals argue that the District Court did not rest its decision on the private agreements, and that, in fact, it had already come to the conclusion that the relevant geographic market was too narrow before it even discussed the private agreements. Although it is impossible for us to know the exact extent of the District Court's consideration of and reliance on the price agreements, the District Court clearly used the price agreements in its assessment of the relevant geographic market when, after noting that the Hospitals cannot walk away from the two insurers or raise their rates for at least five years, it stated:

> The Court simply cannot be blind to this reality when considering the import of the hypothetical monopolist test advanced by the *Merger Guidelines*. Thus, the FTC is essentially asking the Court [to] prevent this merger based on a prediction of what might happen to negotiating position and rates in 5 years.

App. 14. And regardless of whether the private agreements were the sole basis for, or only a part of, the District Court's decision, we conclude that they are not at all relevant to the economic analysis. Thus, considering them, even if not relying on them, is error.

25

App. 14. It declined to make such a prediction "[i]n the rapidly-changing arena of healthcare and health insurance." *Id.*

This reasoning is flawed. We have previously cautioned that, in determining the relevant product market, private contracts are not to be considered. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438-39 (3d Cir. 1997). This same reasoning applies to the relevant geographic market. In determining the relevant market, we "look[] not to the contractual restraints assumed by a particular plaintiff," *id.*, but instead, we answer whether a *hypothetical* monopolist could profitably impose a SSNIP.

For this reason, private contracts between merging parties and their customers have no place in the relevant geographic market analysis. The hypothetical monopolist test is exactly what its name suggests: hypothetical. This is for good reason. If we considered the agreements, then our inquiry would be simple: the Hospitals would not be able to profitably impose a SSNIP because the agreements forbid them from doing so. Determination of the relevant geographic market is a task for the courts, not for the merging entities. Although the District Court declined to predict what might happen to negotiating position and rates, making predictions about parties' and consumers' behavior is exactly what we are asked to do. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963) (noting that the question "whether the effect of the merger 'may be substantially to lessen competition' in the relevant market" requires a "prediction of [the merger's] impact upon competitive conditions in the future").

Moreover, if we allowed such private contracts to impact our analysis, any merging entity could enter into similar agreements—that may or may not be enforceable—to

26

impermissibly broaden the scope of the relevant geographic market. This would enable antitrust defendants to escape effective enforcement of the antitrust laws. *See Queen City Pizza*, 124 F.3d at 438 ("Were we to adopt plaintiffs' position that contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, any exclusive dealing arrangement, output or requirement contract, or franchise tying agreement would support a claim for violation of antitrust laws."). Although private pricing agreements may be an effective tool for the FTC and merging parties to utilize in regulatory actions, they have no place in the antitrust analysis we engage in today.

\* \* \*

These errors together render the District Court's analysis economically unsound and not reflective of the commercial reality of the healthcare market. In recent years, economists have concluded that the use of patient flow data does not accurately portray the relevant geographic market in the hospital merger context. Instead, economists have proposed, and the FTC has implemented, the hypothetical monopolist test. The realities of the healthcare market—in which payors negotiate prices for GAC services and will therefore feel the impact of any price increase—dictate that we consider the payors in our analysis. The District Court did not properly formulate the hypothetical monopolist test, nor did it properly apply that test. Because our antitrust analysis must be consistent with the evolution of economic understanding, *Kimble*, 135 S. Ct. at 2412-13, and must be tied to the commercial realities of the specific industry at issue, *Brown Shoe*, 370 U.S. at 336, we hold that the District Court committed legal error in failing to properly formulate and apply the hypothetical monopolist test.

27

We emphasize, however, that our holding is narrow. We are not suggesting that the hypothetical monopolist test is the only test that the district courts may use in determining whether the Government has met its burden to properly define the relevant geographic market. In our case, the District Court, the Hospitals, and the Government all agreed that the hypothetical monopolist test was the proper standard to apply. The District Court identified the standard and purported to apply it. But in doing so, it incorrectly defined and misapplied that standard. This was error.

*iv. The Government Has Properly Defined the Relevant Geographic Market*

Our conclusion that the District Court incorrectly formulated and misapplied the proper standard does not end the inquiry. We must still determine whether the Government has met its burden to properly define the relevant geographic market. We conclude that it has.

The Government presented extensive evidence showing that insurers would have no choice but to accept a price increase from a combined Hershey/Pinnacle in lieu of excluding the Hospitals from their networks. First, two of Central Pennsylvania's largest insurers—Payor A and Payor B—testified that they could not successfully market a network to employers without including at least one of the Hospitals. Gov't Br. 13-14, 37-38. Payor A's representative stated in his deposition that "[y]ou wouldn't have a whole lot of choice" if Hershey and Pinnacle raised their prices following a merger and there was no price agreement; that "there would be no network without" a combined Hershey and Pinnacle; and that the combined entity would have more bargaining leverage. *Id.* at 14; *see* Corrected Reply Br. 13-14. He estimated that the insurer would lose half of its

membership in Dauphin County if they tried to market a plan that excluded Pinnacle and Hershey. Gov't Br. 13-14; Corrected Reply Br. 14 n.9.

He further testified that the insurer previously used the possibility of creating a network that included only Holy Spirit and Hershey in the Harrisburg market in order to get Pinnacle to accept lower prices. Corrected Reply Br. 13. According to him, insurers used the separate existence of Pinnacle and Hershey at the bargaining table: in order to resist a large price increase from Pinnacle, Payor A threatened to form a network with Holy Spirit and Hershey, excluding Pinnacle. After making this threat, Payor A and Pinnacle were able to come to an agreement that included only modest rate increases. The representative conceded that, without the ability to create a network with Hershey, this threat would not have been credible—Payor A could not have threatened to form a network with only Holy Spirit. Gov't Br. 15. This is strong evidence that the separate existence of Pinnacle and Hershey constrains prices.

A representative from a second large insurer, Payor B, also expressed concerns that the Hospitals would control greater than 50% of the market and would have too much leverage. Gov't Br. 16, 38. He testified that the insurer would need to market a combined Hershey/Pinnacle in its network in order to be marketable. *Id.* at 14-15, 37-38; Corrected Reply Br. 14. Employers in the area similarly stated that they would have a difficult time marketing a health plan without the Hospitals after the merger. Corrected Reply Br. 20 n.12.

The results of one natural experiment also support the insurer's testimony. From 2000 until 2014, Payor E was able to market a viable network in Harrisburg that included only Holy Spirit and Pinnacle but did not include Hershey. In

29

August 2014, Pinnacle terminated its agreement with Payor E. After losing Pinnacle from its network, Payor E negotiated substantial discounts with Holy Spirit and large hospitals in York and Lancaster counties and was able to offer plans at a substantial discount. Despite being priced much lower than its competitors, Payor E lost half its members, who switched to other health plans. Gov't Br. 13-14. Brokers informed the Payor E representative that it no longer had a viable network without Pinnacle, and even in the face of substantial discounts for Payor E's health plan, patients were willing to pay more to other insurers for health plans that included Hershey or Pinnacle. Corrected Reply Br. 16.

Finally, payors testified that they consider the Harrisburg area a distinct market and do not consider hospitals in other areas, such as York or Lancaster counties, to be suitable alternatives. Gov't Br. 18 & n.4.

The Hospitals argue that the payors have enough bargaining leverage that they would be able to defeat a SSNIP. In the Hospitals' view, the payors, which supply patients to the Hospitals, can threaten to exclude the Hospitals from their network; this would in turn cause the Hospitals to lose significant numbers of patients. Such a loss would render the SSNIP unprofitable and therefore does not satisfy the hypothetical monopolist test. No one disputes that the parties both have bargaining leverage when negotiating reimbursement rates. The question here, however, is whether the merger will cause such a significant increase in the *Hospitals'* bargaining leverage that they will be able to profitably impose a SSNIP and, in the face of demand for the SSNIP, whether the payors will be forced to accept it. In other words, whatever leverage the payors will have after the merger, they have that leverage now. The Government's evidence shows that the increase in the Hospitals' bargaining

leverage as a result of the merger will allow the post-merger combined Hershey/Pinnacle to profitably impose a SSNIP on payors.

All of the aforementioned evidence answered an even narrower question than the one presented: the Government was not required to show that payors would accept a price increase rather than excluding the merged Hershey/Pinnacle entity from their networks; it was required to show only that payors would accept a price increase rather than excluding *all* of the hospitals in the Harrisburg area. That is the inquiry under the hypothetical monopolist test. Considering the evidence put forth by the Government, we conclude that the Government has met its burden to properly define the relevant geographic market. It is the four-county Harrisburg area.

## 2. Prima Facie Case

"Once the relevant geographic market is determined, a prima facie case is established if the plaintiff proves that the merger will probably lead to anticompetitive effects in that market." *St. Alphonsus*, 778 F.3d at 785. Market concentration is a useful indicator of the likely competitive, or anticompetitive, effects of a merger. *Merger Guidelines*, § 5.3, at 18; *see also H.J. Heinz*, 246 F.3d at 715-16 ("Increases in concentration above certain levels are thought to raise a likelihood of interdependent anticompetitive conduct." (internal quotation marks and alterations omitted)).

Market concentration is measured by the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by summing the squares of the individual firms' market shares. In determining whether the HHI demonstrates a high market concentration, we consider both the post-merger HHI number and the increase in the HHI resulting from the merger. *Merger Guidelines*, § 5.3, at 18-19. A post-merger market

with a HHI above 2,500 is classified as "highly concentrated," and a merger that increases the HHI by more than 200 points is "presumed to be likely to enhance market power." *Id.* § 5.3, at 19. The Government can establish a prima facie case simply by showing a high market concentration based on HHI numbers. *See St. Alphonsus*, 778 F.3d at 788 ("The extremely high HHI on its own establishes the prima facie case."); *H.J. Heinz*, 246 F.3d at 716 ("Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive.").

The Government put forth undisputed evidence that the post-merger HHI is 5,984—more than twice that of a highly concentrated market. The increase in HHI is 2,582—well beyond the 200-point increase that is presumed likely to enhance market power. Gov't Br. 20. These numbers, the accuracy of which the Hospitals conceded at oral argument, are significantly higher than post-merger HHIs and HHI increases that other courts have deemed presumptively anticompetitive. *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014) (post-merger HHI of 4,391 and HHI increase of 1,078 was presumptively anticompetitive), *cert. denied*, 135 S. Ct. 2049 (2015); *H.J. Heinz*, 246 F.3d at 716 (post-merger HHI of 4,775 and HHI increase of 510 was presumptively anticompetitive). Furthermore, the Government has alleged that the post-merger combined Hershey/Pinnacle will control 76% of the market in Harrisburg. Gov't Br. 3-4, 20. Together, these numbers demonstrate that the merger is presumptively anticompetitive.

### 3. Rebutting the Prima Facie Case

Once the Government has established a prima facie case that the merger may substantially lessen competition, the burden shifts to the Hospitals to rebut the Government's

prima facie case. In order to rebut the prima facie case, the Hospitals must show either that the combination would not have anticompetitive effects or that the anticompetitive effects of the merger will be offset by extraordinary efficiencies resulting from the merger. *See H.J. Heinz*, 246 F.3d at 718-25. The Hospitals present two efficiencies-based defenses. First, they put forth considerable evidence in an attempt to show that the merger will produce procompetitive effects, including relieving Hershey's capacity constraints and allowing Hershey to avoid construction of an expensive bed tower that would save $277 million—savings which could be passed on to patients. Second, the Hospitals claim that the merger will enhance their efforts to engage in risk-based contracting. And finally, in addition to their efficiencies defense, the Hospitals argue that, because of repositioning by other hospitals in the area, the merger will not have anticompetitive effects.

### *a. Efficiencies Defense*

We note at the outset that we have never formally adopted the efficiencies defense. Neither has the Supreme Court. Contrary to endorsing such a defense, the Supreme Court has instead, on three occasions, cast doubt on its availability. First, in *Brown Shoe*, the Supreme Court, though acknowledging that mergers may sometimes produce benefits that flow to consumers, reasoned that "Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization." 370 U.S. at 344. Next, in *Philadelphia National Bank*, the Supreme Court made clear that

> a merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social

or economic debits and credits, it may be deemed beneficial. … Congress determined to preserve our traditionally competitive economy. It therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid.

374 U.S. at 371. Finally, in *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967), the Supreme Court cautioned that "[p]ossible economies cannot be used as a defense to illegality." *Id.* at 580.[8]

Based on this language and on the Clayton Act's silence on the issue, we are skeptical that such an efficiencies defense even exists. Nevertheless, other courts of appeals have held that the efficiencies defense is cognizable. *E.g.*, *Univ. Health*, 938 F.2d at 1222 ("We think … that an efficiency defense to the government's prima facie case in section 7 challenges is appropriate in certain circumstances."). And still others have analyzed the efficiencies to determine whether they might overcome the presumption of illegality. *See St. Alphonsus*, 778 F.3d at 788-

---

[8] Some commentators have argued that, because the efficiencies defense has never been squarely presented to the Supreme Court, the issue has never been definitively decided. Moreover, they suggest that, although possible economies are not a defense, efficiencies that do not lessen competition and are certain, as opposed to merely possible, may be enough to rebut the presumption of illegality. *See* Mark N. Berry, *Efficiencies and Horizontal Mergers: In Search of a Defense*, 33 San Diego L. Rev. 515, 525 (1996); Timothy J. Muris, *The Efficiency Defense Under Section 7 of the Clayton Act*, 30 Case W. Res. L. Rev. 381, 412-13 (1980).

92 (expressing skepticism that the defense exists but nevertheless addressing it); *H.J. Heinz*, 246 F.3d at 720 (acknowledging that the Supreme Court has never "sanctioned the use of the efficiencies defense," but noting that "the trend among lower courts is to recognize the defense"); *see also ProMedica Health*, 749 F.3d at 571 (recognizing that merging parties often put forth the efficiencies defense). The FTC's *Merger Guidelines* also recognize the defense. *See Merger Guidelines*, § 10, at 30 ("The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market."). Because we conclude that the Hospitals cannot clearly show that their claimed efficiencies will offset any anticompetitive effects of the merger, we need not decide whether to adopt or reject the efficiencies defense. However, because the District Court concluded otherwise, we address the requirements of the efficiencies defense and each of the Hospitals' claimed benefits in turn.

Those courts of appeals to recognize the defense have articulated several requirements, which are also found in the *Merger Guidelines*. In order to be cognizable, the efficiencies must, first, offset the anticompetitive concerns in highly concentrated markets. *See St. Alphonsus*, 778 F.3d at 790. Second, the efficiencies must be "merger specific," *id.*— meaning, "they must be efficiencies that cannot be achieved by either company alone." *H.J. Heinz*, 246 F.3d at 722. Otherwise, "the merger's … benefits [could] be achieved without the concomitant loss of a competitor." *Id.* Third, the efficiencies "must be verifiable, not speculative," *St. Alphonsus*, 778 F.3d at 791; they "must be shown in what economists label 'real' terms." *Univ. Health*, 938 F.2d at 1223 (quoting *Procter & Gamble*, 386 U.S. at 604 (Harlan, J.,

35

concurring)). Finally, the efficiencies must not arise from anticompetitive reductions in output or service. *Merger Guidelines*, § 10, at 30.

Remaining cognizant that the "language of the Clayton Act must be the linchpin of any efficiencies defense," and that the Clayton Act speaks in terms of "competition," we must emphasize that "a successful efficiencies defense requires proof that a merger is not, despite the existence of a prima facie case, anticompetitive." *St. Alphonsus*, 778 F.3d at 790. The presumption of illegality may be overcome only where the defendants "demonstrate that the intended acquisition would result in significant economies and that these economies ultimately would benefit competition and, hence, consumers." *Univ. Health*, 938 F.2d at 1223.

Efficiencies are not the same as equities. In assessing whether a preliminary injunction may issue in a Section 7 case, a court must always weigh the equities as part of its determination that granting the injunction would be in the public interest. This essential step is expressly required by Section 13(b) of the FTC Act: "Upon a proper showing that, *weighing the equities* and considering the Commission's likelihood of ultimate success, such action would be in the public interest … a preliminary injunction may be granted … ." 15 U.S.C. § 53(b) (emphasis added). The efficiencies defense, on the other hand, is a means to show that any anticompetitive effects of the merger will be offset by efficiencies that will ultimately benefit consumers. It is not mentioned in Section 7 of the Clayton Act, nor is it part of the standard for granting a preliminary injunction.

Some of the considerations may overlap, but they are properly viewed as distinct inquiries, in part, because of the rigorous standard that applies to efficiencies, which must be

merger specific, verifiable, and must not arise from any anticompetitive reduction in output or service. And importantly, the efficiencies defense, because it is aimed at rebutting the Government's prima facie case that the merger is anticompetitive, must "demonstrate that the prima facie case portrays inaccurately the merger's probable effects on competition." *St. Alphonsus*, 778 F.3d at 790 (internal quotation marks and alterations omitted). The District Court analyzed several claimed efficiencies and concluded that they weigh in favor of denying the preliminary injunction. But it did not address whether those claimed efficiencies meet the demanding scrutiny that the efficiencies defense requires.[9]

Our review of the Hospitals' claimed efficiencies leads us to conclude that they are insufficient to rebut the presumption of anticompetitiveness. With respect to the Hospitals' capacity constraints and capital savings claims, the District Court found that the merger will alleviate Hershey's

---

[9] The District Court engaged in an analysis of what it called "equities," even though it held that the Government failed to demonstrate a likelihood of success on the merits. But after articulating the standard for weighing the equities as required by Section 7, the District Court immediately articulated the standard for the efficiencies defense. App. 16-17. It then, in its discussion of the equities, considered the Hospitals' claims that: (1) the proposed merger would alleviate Hershey's capacity constraints, App. 17-23; (2) repositioning by competitors will constrain prices at Hershey and Pinnacle, App. 23-25; (3) the merger will increase the Hospitals' ability to adapt to risk-based contracting, App. 25-27; and (4) the public interest will be served by the merger, App. 27-28.

capacity constraints because, upon consummating the merger, Hershey will immediately be able to transfer patients to Pinnacle. The District Court also credited the testimony of Hershey CEO Craig Hillemeier that, because Hershey will transfer patients to Pinnacle, it can avoid constructing a new planned bed tower aimed at providing additional beds at Hershey, resulting in capital savings of nearly $277 million.

The parties dispute whether capital savings can constitute efficiencies. *Compare FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1300-01 (W.D. Mich. 1996) (capital savings are cognizable efficiencies), *with FTC v. ProMedica Health Sys., Inc.*, No. 3:11-cv-47, 2011 WL 1219281, at *36-37 (N.D. Ohio Mar. 29, 2011) (capital savings are not cognizable efficiencies). We turn to the *Merger Guidelines* in answering this question. As the *Merger Guidelines* explain, competition is what "usually spurs firms to achieve efficiencies internally." *Merger Guidelines*, § 10, at 29. One of the rationales for recognizing the efficiencies defense is that a merger may produce efficiencies that "result in lower prices, improved quality, enhanced service, or new products." *Id.* Thus, although capital savings, in and of themselves, would not be cognizable efficiencies, we can foresee that an antitrust defendant could demonstrate that its avoidance of capital expenditures would benefit the public by, for example, lowering prices or improving the quality of its services. In such a case, so long as the capital savings result in some tangible, verifiable benefit to consumers, capital savings may play a role in our efficiencies analysis.

Our recognition that capital savings are cognizable efficiencies does not decide this issue, however, because even if capital savings are efficiencies, they must nonetheless be verifiable and must not result in any anticompetitive reduction in output. It is on these requirements that the

Hospitals' efficiencies claim fails. As an initial matter, we are bound to accept the District Court's findings of fact unless they are clearly erroneous. And, as the District Court observed, we do not second guess the business judgments of Hershey's able executives. We do, however, require that the Hospitals provide clear evidence showing that the merger will result in efficiencies that will offset the anticompetitive effects and ultimately benefit consumers. First, the evidence is ambiguous at best that Hershey needed to construct a 100-bed tower to alleviate its capacity constraints. The Hospitals' own efficiencies analysis shows that Hershey needs only thirteen additional beds in order to operate at 85% capacity, which is a hospital's optimal occupancy rate. App. 18; Corrected Reply Br. 28 n.18. Second, Hershey's ability to forego building the 100-bed tower is a reduction in output. The *Merger Guidelines* expressly indicate that the FTC will not consider efficiencies that "arise from anticompetitive reductions in output or service." *Merger Guidelines*, § 10, at 30.

Even if we were to agree with the Hospitals that their ability to forego building a new 100-bed tower as a result of the merger is a cognizable efficiency that is verified, merger specific, and did not arise from any anticompetitive reduction in output, we cannot overlook that the HHI numbers here eclipse any others we have identified in similar cases. They render this combination not only presumptively anticompetitive, but so likely to be anticompetitive that "extraordinarily great cognizable efficiencies [are] necessary to prevent the merger from being anticompetitive." *Id.* § 10, at 31. This high standard is not met here—nor, we note, has this high standard been met by any proposed efficiencies considered by a court of appeals.

Second, the Hospitals claim that the merger will

enhance their efforts to engage in risk-based contracting. Risk-based contracting is an alternative payment model to the traditional fee-for-service model in which healthcare providers bear some of the financial risk and upside in the cost of treatment.[10] The Hospitals' expert testified that large systems that control the entire continuum of care are better suited to risk-based contracting, partly because they are able to spread out the financial risk involved. App. 26. The Government disputes that a system as large as the combined Hershey/Pinnacle system has any advantages over a smaller, albeit still large, healthcare system. Gov't Br. 53; Corrected Reply Br. 29. The District Court seemingly agreed with the Government that both Pinnacle and Hershey are capable of independently operating under the risk-based contracting model. App. 26. But it found that the merger will be beneficial to the Hospitals' ability to engage in risk-based contracting, which in turn will allow Hershey "to continue to use its revenue to operate its College of Medicine and draw high-quality medical students and professors into the region." *Id.*

Irrespective of whatever benefits the merger may bestow upon the Hospitals in increasing their ability to

---

[10] In risk-based contracting, healthcare providers bear some financial risk and share in the financial upside based on the quality and value of the services they provide. Consider the following hypothetical example: A payor would pay the hospital $300 per member per month to care for a member. If the patient is generally in good health and goes to the doctor once per year, the hospital still receives the $300/month payment and can keep the excess. But if the patient is sick and requires much more expensive treatment, the hospital still receives only $300/month and must bear the excess cost.

engage in risk-based contracting, the Hospitals must demonstrate that such a benefit would ultimately be passed on to consumers. It is not clear from the record how this would be so beyond the mere assertion that it would save the Hospitals money and such savings would be passed on to consumers. We cannot credit the District Court's observation that, because of the benefits to risk-based contracting, Hershey will be able to continue to use its revenue to operate its College of Medicine and draw high-quality medical students and professors to Hershey. An efficiencies analysis requires more than speculative assurances that a benefit enjoyed by the Hospitals will also be enjoyed by the public. It is similarly unclear how this ability to engage in risk-based contracting will counteract any of the anticompetitive effects of the merger. Finally, the District Court's finding that both Pinnacle and Hershey are capable of independently engaging in risk-based contracting contravenes its conclusion that this is a cognizable efficiency because the benefit is not merger specific. *See H.J. Heinz*, 246 F.3d at 722 (the efficiencies must not be achievable by either company alone; otherwise, the merger's benefits could be achieved without the loss of a competitor).

### b. Anticompetitive Effects

In an attempt to show that the merger will not, despite high HHI numbers, produce anticompetitive effects, the Hospitals claim that repositioning—the response by competitors to offer close substitutes offered by the merging firms—will be sufficient to constrain post-merger prices. The *Merger Guidelines* recognize that, in certain cases, repositioning by other competitors may be sufficient to deter or counteract the anticompetitive effects of a merger. *Merger Guidelines*, § 6.1, at 22. In evaluating repositioning, the *Merger Guidelines* call for consideration of "timeliness,

likelihood, and sufficiency." *Id.* The District Court noted that "the market that Hershey and Pinnacle exist within has already been subject to extensive repositioning." App. 23. It specifically noted that Geisinger Health System recently acquired Holy Spirit Hospital near Harrisburg; WellSpan Health acquired Good Samaritan Hospital in Lebanon County; the University of Pennsylvania acquired Lancaster General Hospital in Lancaster County; and Community Health Systems acquired Carlisle Regional Hospital in Cumberland County. App. 24. We agree that these recent affiliations and acquisitions, at least in the Harrisburg area, assuage some of the concerns that the proposed combination will have anticompetitive effects. We do not believe, however, that repositioning by these hospitals would have the ability to constrain post-merger prices, as evidenced by the extensive testimony by payors that "there would be no network" without Hershey and Pinnacle.

We therefore conclude that the Hospitals have not rebutted the Government's prima facie case that the merger is likely to be anticompetitive. Accordingly, we hold that the Government has carried its burden to demonstrate that it is likely to succeed on the merits.

## B. Weighing the Equities

"Although the [Government's] showing of likelihood of success creates a presumption in favor of preliminary injunctive relief, we must still weigh the equities in order to decide whether enjoining the merger would be in the public interest." *H.J. Heinz*, 246 F.3d at 726; *see* 15 U.S.C. § 53(b). The question is whether the harm that the Hospitals will suffer if the merger is delayed will, in turn, harm the public more than if the injunction is not issued. *See Univ. Health*, 938 F.2d at 1225. Once we determine that the proposed

merger is likely to substantially lessen competition, the Hospitals "face a difficult task in justifying the nonissuance of a preliminary injunction." *Id.*

Although the statute mandates that we weigh the "equities," it is silent as to what specifically those equities are. The prevailing view is that, although private equities may be considered, they are not to be afforded great weight. *See id.* ("While it is proper to consider private equities in deciding whether to enjoin a particular transaction, we must afford such concerns little weight."); *H.J. Heinz*, 246 F.3d at 727 n.25 (same). *But see FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1346 (4th Cir. 1976) (Winter, J., sitting alone) ("All of these reasons go to the *private* injury which may result from an injunction … . [T]hey are not proper considerations for granting or withholding injunctive relief under § 13(b)."). Because private equities are afforded little weight, they cannot outweigh effective enforcement of the antitrust laws. *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981) (Ginsburg, J.). Thus, although we may consider private equities in our weighing of the equities, wherever the Government "demonstrates a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger." *Id.*

"The principal equity weighing in favor of issuance of the injunction is the public's interest in effective enforcement of the antitrust laws." *Univ. Health*, 938 F.2d at 1225. The purpose of Section 13(b) is to preserve the status quo and allow the FTC to adjudicate the anticompetitive effects of the proposed merger in the first instance. *Food Town Stores*, 539 F.2d at 1342. This factor is particularly important here because should the Hospitals consummate the merger and the FTC subsequently determine that it is unlawful, divestiture

43

would be the FTC's only remedy. At that point, since it is extraordinarily difficult to "unscramble the egg," *Univ. Health*, 938 F.2d at 1217 n.23,[11] "it will be too late to preserve competition if no preliminary injunction has issued." *H.J. Heinz*, 246 F.3d at 727; *see Univ. Health*, 938 F.2d at 1225.

On the other side, the Hospitals claim that granting the injunction would "preclude the many public benefits recognized by the [district] court." Hosps. Br. 49. In making this argument, the Hospitals misconstrue our equities inquiry. By statute, we are required to weigh the equities in order to decide whether granting the injunction would be in the public interest. In answering this question, therefore, we consider whether the *injunction,* not the *merger*, would be in the public interest.

Mindful of the limited scope of our inquiry, we believe that the injunction will not deprive the public of the many benefits found by the District Court. All of the Hospitals' alleged benefits will still be available upon consummation of the merger, even if we were to grant an

---

[11] Although the District Court was correct that it may not be impossible to order divestiture, courts have repeatedly recognized that it is difficult to do so, especially considering the practical implications of denying the preliminary injunction request. For instance, upon consummating the merger, the Hospitals will presumably share confidential information and begin transferring patients from Hershey to Pinnacle. Should the FTC adjudication determine that the merger is unlawful, the FTC will be tasked with divorcing the Hospitals' now-shared confidential information and forcing patients to return to Hershey. These practical difficulties cannot be written off so easily.

injunction and the FTC were to subsequently determine the merger is lawful. Although the Hospitals have indicated in their briefs to this Court that they "'would have to abandon the combination rather than continu[e] to expend substantial resources litigating' if an injunction is issued," Hosps. Br. 49 (quoting Hosps. Pre-Hrg. Br. 2), they offer no support beyond mere recitation that they would do so. Even more, the District Court made the exact opposite finding below. *See* App. 27 ("[W]e note that the parties have not emphasized, and we do not credit, any argument that an injunction would kill this merger … ." (internal quotation marks omitted)).

Nevertheless, even accepting the Hospitals' assertion that they would abandon the merger following issuance of the injunction, the result—that the public would be denied the procompetitive advantages of the merger—would be the Hospitals' doing. We see no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a FTC adjudication on the merits that finds the merger lawful.

On balance, the equities favor granting the injunction. None of the private equities, or those equities that may have public benefit, on the Hospitals' side of the ledger are sufficient to overcome the public's strong interest in effective enforcement of the antitrust laws. We recognize that certain extrinsic factors have made these types of mergers beneficial—perhaps even necessary—to the continued success of some hospital systems. Yet, in this case, we are tasked with deciding only whether preliminary injunctive relief would be in the public interest. Opining on the soundness of any legislative policy that may have compelled the Hospitals to undertake this merger is not within our purview.

45

## V. Conclusion

We therefore conclude that, after determining the Government's likelihood of success and weighing the equities, a preliminary injunction would be in the public interest. Accordingly, we will reverse the District Court's denial of the Government's motion for a preliminary injunction. We will also remand the case and direct the District Court to preliminarily enjoin the proposed merger between Hershey and Pinnacle pending the outcome of the FTC's administrative adjudication.